IN THE UNITED STATES DISCRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMY FRANKLIN AND | ) | |
| TAJUANA SAVAGE dba | ) | |
| CTRL KICTCHEN INC. | ) | |
| J. SPICE INC. and T.J. SWEETSBAR INC. | ) | |
| Illinois Corporations. | ) | No. |
| | ) | Honorable Judge: |
| Plaintiff, | ) | Magistrate Judge |
| | ) | |
| V. | ) | JURY TRIAL  DEMANDED |
| | ) | $10,,000,000.00 in Compensatory |
| INDUSTRIAL COUNCIL OF NEARWEST | ). | Damages, and $10,000,000.00 |
| CHICAGO (ICNC) A Non-profit Organization | ). | In Punitive Damages |
| and, ALLIES FOR COMMUNITY BUSINESS | ) | |
| (A4CB), A Non-profit Organization in Chicago | ) | |
| Illinois, commonly referred to as | ) | |
| THE HATCHERY CHICAGO, A Joint. | ) | |
| | ) | |
| Defendants | | |

**COMPLAINT FOR RACIAL DISCRIMINATION IN COMMERCIAL LEASING IN
VIOLATION OF THE CIVIL RIGHTS ACT OF 1866 (42 U.S.C. SECTION 1982),
CONSTRUCTIVE EVICTION AND TORTIOUS INTERFERENCE WITH BUSINESS
EXPECTANCY**

NOW COMES PLAINTIFF, JAMY FRANKLIN and TAJUANA SAVAGE, doing business as CTRL KICTCHEN INC., J. SPICE INC. and T.J. SWEETSBAR INC., by and through their attorneys, David E. Neely & Associates, and brings this civil action under The Civil Rights Act of 1866 (42 U.S.C. § 1982 ("Section 1982"), against, defendants INDUSTRIAL COUNCIL OF NEARWEST CHICAGO (ICNC), and ALLIES FOR COMMUNITY BUSINESS (A4CB), doing business as and commonly referred to as THE HATCHERY, CHICAGO, a Not For-Profit Joint Venture, and in support thereof states:

**NATURE OF THE ACTION**

1. This is a federal Civil Rights Action seeking money damages for violations of Plaintiff's rights under The Civil Rights Act of 1866 (42 U.S.C. § 1982 which

prohibits discrimination in the rental of all property, both public and private and supplemental claims of Constructive Eviction and Tortious Interference of Business Expectancy in Commercial Leases;

## JURISDICTION AND VENUE

2. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Plaintiff's States claims pursuant to 28 U.S.C. §1367;

3. Venue is proper because all the claims arose in the Northern District of Illinois, Eastern Division;

## THE PARTIES

4. INDUSTRIAL COUNCIL OF NEARWEST CHICAGO (ICNC) is a glorified landlord;

5. ALLIES FOR COMMUNITY BUSINESS (A4CB) is a predatory loan option organization;

6. ICNC and Allies for Community Business came together to form The Hatchery, Chicago, a non-profit food and beverage incubator allegedly dedicated to helping local entrepreneurs build and grow successful businesses;

7. THE HATCHERY joint venture reports to a collective Board made up of THE INDUSTRIAL COUNCIL OF NEARWEST CHICAGO'S (ICNC) and ALLIES FOR COMMUNITY BUSINESS (A4CB) (Formerly Accion Chicago);

8. JAMY FRANKLIN is an African American male chef AND TAJUANA SAVAGE is an African American female chef and are small business entrepreneurs and the owners of CTRL KICTCHEN INC., J. SPICE INC. and T.J. SWEETSBAR INC;.

### I.      STATEMENT OF FACTS

9. THE HATCHERY Chicago is a non-profit food and beverage business incubator that is supposed to enable and help local entrepreneurs on the near West Side of Chicago build and grow successful businesses through cutting edge commercial kitchen

2

facilities, robust entrepreneurship curriculum, and through partnerships with generous corporate sponsors and foundations; and those successful businesses, in turn, are supposed to create economic growth and new job opportunities in their communities.

10. NATALIE SHMULIK, a white female, is the CEO of THE HATCHERY joint venture during the periods alleged in this complaint;

11. STEVE DEBRETTO, a white male, was the CEO of the INDUSTRIAL COUNCIL OF NEARWEST CHICAGO (ICNC) and then THE HATCHERY, Chicago Joint Venture;

12. CHAPIN CONNOR, a white male, was Chief Of Operations of THE HATCHERY, Chicago Joint Venture from 2020 through 2021;

13. DANI ZUCHOVICKIC, a white female, was Community & Membership Manager for ICNC and then for THE HATCHERY, Chicago Joint Venture from 2019 until she was forced to resign in January 2024;

14. LAURA BOGGIONI and KOVITZ SHIFRIN NESBIT, are white lawyers used by THE HATCHERY, Chicago Joint Venture to threaten and collect predatory funds from Plaintiffs;

15. The BOARD OF DIRECTORS of THE HATCHERY joint venture consist of all white members who ignore grievances from its African American, minority owned resident/tenants and female employees and terminate those who complain about its discriminatory practices;

16. MAISON CUISINE, a white owned business who is allowed to reside in California, while operating from THE HATCHERY, Chicago Joint Venture is treated more favorably than African American resident business owners who must reside on the West Side of Chicago;

17. MARY FRAN RILEY, a white female, is Director of Community Relationships for A4CB, and her son, NICK FRAN MAGGIOIS is the Lead Sales & Event Manager for Maison Cuisine; and NICK is treated more favorably than Plaintiffs' and other minority owned-business tenants/residents because he is given free access to facilities which minority business owners must pay for;

18. SHANELL Rainey, an African American female supervised the Impact Program and the Hatch Made Meals Program until she was forced to resign by THE HATCHERY joint venture;

19. CHEF ARAM REED, a white male business owner was treated more favorably financially and under different rules of access than African American and West Side business tenant/residents;

20. CHEF ARAM REED, a white male is allowed to reside in Costa Rico and operate his business, CHICAGO PERSONAL CHEF, from the Hatchery Joint Venture and is treated more favorably and under different rules than African American and West Side owned business residents/tenants;

21. ERICA BOYD, an African American female employee of THE HATCHERY joint venture is privy to all its racially discriminatory and illegal practices;

22. NAIHAL WAJID, of South African Indian descent, was Events and Marketing Coordinator from October 2019 through April 2021 and had first-hand knowledge of THE HATCHERY joint venture racially discriminatory practices;

23. PRISCILLA TORRANCE, is an African American female, in charge of Human Resources and is privy to THE HATCHERY joint venture discriminatory conduct;

24. MONIQUE KILGORE, an African American female, is Director of Operations and privy to the discriminatory conduct alleged herein;

1. **PLAINTIFFS' WERE DISCOURAGED FROM EXERCISING RIGHT TO LEASE COMMERCIAL REAL ESTATE**

25. In the summer of 2019 Plaintiffs walked into THE HATCHERY, CHICAGO Joint Venture to get information about its programs and were not greeted by anyone;

26. After waiting for an unreasonable amount of time to talk to someone, Plaintiffs wrote down the website and telephone number and left the facility;

27. Plaintiffs completed an on-line application with The Hatchery-ICNC Joint Venture to become residents at THE HATCHERY, CHICAGO Joint Venture, with hopes and expectations of owning their own kitchen, obtaining affordable space, and receiving

4

business assistance in an entrepreneurial community so they could share their business ideas and contribute to their respective community;

28. Months passed and THE HATCHERY, CHICAGO Joint Venture acted upon Plaintiffs application to become residents of THE HATCHERY, CHICAGO Joint Venture joint venture;

29. Plaintiffs had a difficult time getting their application accepted by THE HATCHERY, CHICAGO Joint Venture while white and affluent businesses and individuals were being accepted on a regular basis, sometimes without completing an application or being approved by the Board as per the rules;

30. Throughout the Summer and Fall of 2019, Plaintiffs continued to call and make contact with THE HATCHERY, CHICAGO Joint Venture administrative staff via the internet but were continuously ignored pursuant to defendant's policy and practice of ignoring African American applicants;

31. On December 19, 2019, after months of waiting, Plaintiffs application was accepted by THE HATCHERY, CHICAGO Joint Venture;

2. **PROMISES AND BUSINESS EXPECTANCIES MADE AND CREATED BY THE HATCHERY, CHICAGO JOINT VENTURE**

32. Plaintiffs' images and likeness are depicted in photographs featured on the front page of THE HATCHERY, CHICAGO Joint Venture website and also featured on the outside of the building showing Plaintiffs' mentoring students; although Plaintiffs were constructively evicted from THE HATCHERY, Chicago Joint Venture;

33. Plaintiffs' were promised the right to lease commercial property from The Hatchery Joint Venture 67,000 square foot facility located at the corner of Lake and Kedzie in Chicago's Garfield Park neighborhood and of a liked broad range of other property rights pursuant to The Hatchery's joint venture mission, including but not limited to the right to:

   a. an innovative community to grow their small businesses through incubation, workforce development, neighborhood planning, and business advising;
   b. tools, resources and access to affordable and discounted services;

5

    c.   an equitable and inclusive environment;

    d.   the opportunity to hold events that are relevant to its business;

    e.   community advocacy by The Hatchery joint venture on behalf of their business;

    f.   business services, career opportunities and training, affordable space, business assistance and an entrepreneurial ecosystem to grow and contribute to their community;

    g.   comprehensive human resources consulting, hands on management of the hiring process and impact Culinary Training, a 12-week, no-cost training program for young adults on Chicago's West Side to complete training to become a prep cook;

    h.   an opportunity to strengthen Plaintiffs' company and to facilitate economic and community development";

34. THE HATCHERY, CHICAGO Joint Venture is a 67,000 square foot facility located at the corner of Lake and Kedzie in Chicago's Garfield Park neighborhood and makes it extremely difficult for minority applicants to apply because no one is even available to talk with them, but they are always available to talk with white applicants;

35. Plaintiffs had a valid business expectancy when they applied to become resident/tenants with THE HATCHERY joint venture and defendants had knowledge of that expectancy;

36. THE HATCHERY, CHICAGO Joint Venture made the following promises and created the following business expectancy in Plaintiffs and other minority owned business:

    a.   promised to offer West Side Community entrepreneurs an innovative community to grow small businesses through incubation, workforce development, neighborhood planning, and business advising; (but rather, it engages in racially discriminatory and predatory conduct that does not align with its mission);

    b.   to exclusively support entrepreneurs from the West Side of Chicago with the tools, resources and access to affordable and discounted services; (But rather, often leaves minority owned business owners in debt);

    c.   promise to facilitate economic and community development and strengthen individuals, organizations and companies in the Kinzie Industrial Corridor by fostering an equitable and inclusive environment for these minority West Side businesses;

    d.   THE HATCHERY, CHICAGO Joint Venture promised tn hold events that are relevant to minority owned Westside businesses such as locally owned businesses, mom and pop stores and restaurants, but rather, it targets white owned companies involved in venture capital funds, manufacturing and consumer packaging of goods;

e. promises to engage in community advocacy on behalf of minority resident companies on Chicago's West Side, provide business services to minority owned companies, provide career opportunities and training for African American residents on the West Side and promises to provide affordable space, assistance, and an entrepreneurial ecosystem to growing West Side African American companies;

f. promises to provide growing West Side companies in a wide variety of industries affordable space, business assistance, and an entrepreneurial community that they can both benefit from and contribute to their communities;

g. promises to support small African American community based businesses throughout the building with comprehensive human resources consulting, hands on management of the hiring process and impact Culinary Training, a 12-week, no-cost training program for young adults on Chicago's West Side to complete training to become a prep cook;

h. promises in its mission statement "to strengthen companies in the Kinzie Industrial Corridor and to facilitate economic and community development";

37. On May 7, 2024, Plaintiffs' received an email from Dana Harding which stated:

"Hello Taj and Jamy, Thank you for taking the time to meet with us. It is important to our team that you all and your business endeavors are successful. As mentioned in our meeting, here are a few action items:

• Continue to update our team on your plans for a brick and mortar in 2025. We are happy to help wherever we can.
• Be sure to remain diligent on the delivery times established by GCFD. The CTRL team has ensured that all employees will be in compliance with delivery parameters.
• Work on more engagement within the facility's courses offered. Take advantage of your community residence discount on special classes.
• Join us for this collaborative session with experts from Grub hub and Sysco, outlining strategies for ingredient procurement, pricing, menu development, multifaceted product usage, and tools to elevate your restaurant's profitability in the digital age. (Upcoming Events – The Hatchery Chicago).
• We are expecting rent payments to be made in a timely manner moving forward.
• When you are ready to promote your BBQ box, please feel free to share with our marketing team (devin@industrialcouncil.com) so that we can promote it.

38. THE HATCHERY, CHICAGO Joint Venture breached all its duties owed to Plaintiffs because of Plaintiffs' race;

39. THE HATCHERY, CHICAGO Joint Venture's lease agreements are predatory and too high for minority owned businesses, have hidden costs in its prices that are not

feasible for community based businesses, offers kitchen space with no equipment and hidden utility costs and hidden trash removal costs and offers minority owned businesses predatory loans to get out of the economic spider web it pushes them into;

40. THE HATCHERY, CHICAGO Joint Venture has no policies, no accounting systems, does not document most of its transactions, engages in untraceable transactions, misuses funds, engages in racial profiling and harassment and maintains its HR folder on SharePoint and one Microsoft drive;

41. THE HATCHERY, CHICAGO Joint Venture does not engage in community advocacy on behalf of resident companies on Chicago's West Side, does not provide business services to minority owned companies, fails to provide career opportunities and training for African American residents on the West Side and fails to provide affordable space, assistance, and an entrepreneurial ecosystem to growing West Side African American companies;

42. THE HATCHERY, CHICAGO Joint Venture is supposed to, but does not provide growing West Side companies in a wide variety of industries affordable space, business assistance, and an entrepreneurial community that they can both benefit from and contribute to their communities;

43. THE HATCHERY, CHICAGO Joint Venture staff made discriminatory exceptions and bent the rules for white and affluent tenants while people of color were treated as if they were the problem;

44. THE HATCHERY, CHICAGO Joint Venture does not hire and will not consider African Americans for custodial or building engineer jobs after they terminated African American employees who held those positions;

45. Despite receiving significant funding from corporations like Mondelez and Pepsi, THE HATCHERY, CHICAGO Joint Venture pays minority and female staff less than $42,000 per year which creates a lack of incentive and results in limited measurable impact on the West Side residents the organization was intended to serve;

### 3. BOARD OF DIRECTORS OF THE HATCHERY JOINT VENTURE TURNS A BLIND EYE

46. THE HATCHERY, CHICAGO Joint Venture Board ignores grievances from its residents and employees and terminates those who complain about its discriminatory practices;

47. Defendant holds mandatory Zoom monthly Town Hall meetings, but they are not productive because tenant complaints are not welcomed or addressed;

48. It is very difficult to get THE HATCHERY, CHICAGO Joint Venture's Board to listen or take action to stop racial discrimination because the Board does not consist of a single person of color that represent the interest of West Side residents at THE HATCHERY, CHICAGO Joint Venture;

49. When Plaintiffs made proposals to the Board to generate revenue, they were always rejected and the ones that were approved were cancelled;

### 4. ALLIES FOR COMMUNITY BUSINESS (A4CB) ENGAGES IN PREDATORY LOANING

50. THE HATCHERY, CHICAGO Joint Venture through ALLIES FOR COMMUNITY BUSINESS (A4CB) mission is to provide the capital, coaching and connections entrepreneurs needed to grow profitable businesses that create jobs and wealth in their communities, but rather, provide predatory loans that minority owned businesses never recover from;

51. These loans are predatory because A4CB never inquire into the credit history or financial stability of the loan recipient and awards loans to minority tenants knowing they cannot be paid back;

52. After putting Plaintiffs' in financial debt through the predatory leasing of rental property, hidden fees and denial and cancellation of financial and business opportunities, on November 30, 2021Defendants encouraged Plaintiffs to take out a $3,000.00 loan which became past-due by April 1, 2022;

9

**5.** **RACISM AND DISCRIMINATION IN THE INQUIRY, APPLICATION AND ADMISSION PROCESS HAS DISPARATE EFFECT ON RACIAL MINORITIES**

53. Defendants view African Americans as "colored people" and their children as "cute little monkeys";

54. Plaintiffs and many African American business owners and West Side residents/tenants had children and could not afford after school or summer childcare but were not allowed to bring their children into the facility, while white business owners and residents/tenants were allowed to bring their children into the facility;

55. For example, Chef Aram Reed, a white male tenant/resident was allowed to bring his 2-year-old daughter into the building on a regular basis while Plaintiffs' were not allowed to bring their children into THE HATCHERY, CHICAGO Joint Venture;

56. Minority applicants are discouraged from applying to THE HATCHERY, CHICAGO Joint Venture;

57. Minority applicant who physically walk into THE HATCHERY, CHICAGO Joint Venture joint venture facility are never greeted, but always are referred to THE HATCHERY, CHICAGO Joint Venture's website or phone number for more information or to apply;

58. However, white business owners or affluent persons who walk into THE HATCHERY, CHICAGO Joint Venture joint venture facility are always greeted by staff with open arms;

59. THE HATCHERY, CHICAGO Joint Venture caused Plaintiffs and causes other African American applicants to go through a long process of applying through its website while expediting the process for white and affluent applicants;

60. Sometimes white and affluent applicant are allowed to by-pass the application process completely and are granted residency without completing proper paperwork, thereby shortening the turnaround period by weeks;

61. Sometimes white and affluent applicants make lump sum donations to THE HATCHERY, CHICAGO Joint Venture joint venture and are grated immediate residency;

62. For example, THE HATCHERY, CHICAGO Joint Venture accepted a $5,000 monthly donation from "PLUCK IT" for residency/tenancy and allowed this company to by-pass the entire application and approval process;

63. THE HATCHERY, CHICAGO Joint Venture discourages minority owned business and West Side people from applying to its programs by making them wait for an unreasonable amount of time and discourages long term participation by making it unaffordable to participate in the long run;

64. From 2020 throughout 2021, Chapin Connor, a White male and Chief of Operations (COO) allowed white applicants and some affluent non-community based African American businesses to by-pass the application process by directly paying cash to him to become residents at the Hatchery Chicago;

65. Some of these unlawful cash deals required African American residents to pay him up to $5,000 a month to become residents at THE HATCHERY, CHICAGO Joint Venture;

66. Erica Boyd, an African American female employee was privy to some of these cash deals;

67. Nihal Wajid, a South African female of Indian descent, reported Chapin Connor's illegal activity to Priscilla Torrance, an African American female who worked in Human Resources, but no action was taken against him;

68. The company was audited and Chapin Connor resigned before the results of the audit were released;

6. PREDATORY AND DISCRIMINATORY LEASE AGREEMENTS HAS DISPARATE EFFECT OF RACIAL MINORITIES

69. THE HATCHERY, CHICAGO Joint Venture, for example, will charge minority residents with a so called "Community Base Business Rent" with the pretext that the rent is discounted while at the same time increasing rent every six (6) months until minority tenants are paying market rates which they cannot afford;

70. THE HATCHERY, CHICAGO Joint Venture, for example, includes hidden costs in its exorbitant rent prices through the "Community Base Business Rent" which includes providing kitchen space with no equipment and hidden fees such as utilities and trash removal costs on top of rent;

71. When THE HATCHERY, CHICAGO Joint Venture "Community Base Business Rent" becomes so impractical, minority tenants are offered predatory loan options through Allies for Community Business thereby making benefits and discounts economically oppressive;

72. Defendants interfered with Plaintiffs business opportunities and they were not allowed to thrive by taking advantage of defendant's economic programs while paying high rent and incidental fees until they were forced to get a predatory loan which put them in further debt with defendants;

73. Initially, Plaintiffs' were charged $2,600.00 a month for a 250 sq. ft kitchen space plus $300 for a kitchen storage fee, plus fees for utilities and garbage removal while some white residents like Jessica Romanowski who operated Private Catering paid no rent or fees;

74. Some white residents were charged $1,750 a month and others under $700 a month for the same kitchen rental space as African American owned businesses like Plaintiff;

75. THE HATCHERY, CHICAGO Joint Venture engaged in predatory leasing of donated equipment and require minority owned and West Side business residents/tenants to pay monthly exurbanite fees on top of rental fees and hidden costs;

76. For example, Plaintiffs were required to pay $100 a month for a donated table which only cost $100 on the open market;

77. Although equipment is donated to THE HATCHERY, CHICAGO Joint Venture, Plaintiffs and similarly situated residents are forced to pay monthly rental fees for the donated property. For example, Tables @ $50.00 a month, Stoves @ $100.00 a

12

month, Coolers @ $100.00 a month, Refrigerators @ $100.00 a month, Ovens @ $200.00 a month, Warmers @ $100.00 a month, thereby exceeding the value of the donated property by a 1000%;

78. Plaintiffs and similarly situated minority owned businesses were required to exclusively purchase the most expensive cleaning materials from Equal Lab such as Sanitizers @ $190.00 for 2.5 gal and soap @ 430.00 per gal.;

79. Plaintiffs were not allowed to use Commercial Storage Units at THE HATCHERY, CHICAGO Joint Venture but white businesses like Jessica Romanowski who operated "Private Dinning" and Maison Cuisine were allowed to use commercial storage units;

80. When Plaintiffs moved to a 500 sq. ft. kitchen in 2023, they were charged $3,300.00 per month for kitchen space plus $500.00 per month for their old kitchen space that was used as a storage unit;

81. Chef Aram Reed, a white male who operates "Chicago Personal Chef is allowed to operate his business under different rules at THE HATCHERY, CHICAGO Joint Venture than African American residents/tenants while he lives in Costa Rica;

## 7. RACIALLY DISCRIMINATORY RETALIATION IN THE COMPLAINT PROCESS AND TERMINATION OF RESIDENCY/TENANTCY WITHOUT NOTICE

82. Plaintiffs and similarly situated minority resident/tenant business owners did not enjoy the same rights and privileges as is enjoyed by affluent and white business owners to lease real and personal property with THE HATCHERY, CHICAGO Joint Venture hereinafter referred to THE HATCHERY joint venture;

83. THE HATCHERY, Chicago Joint Venture was aware of its racist and discriminatory practices and in the Fall of 2024, hired a private investigator Julius Rhodes of Phenix Investigations to interview minority resident business owners of which many were reluctant to talk with him, including Plaintiffs;

84. In the Fall of 2024, Investigator Rhodes called Plaintiffs' and left a message which stated: "…we spoke earlier today, it's about 2:40, you said you would be available around 2:30, sorry to be a little bit late, if you want to talk give me a call, if not, that's fine as well";

85. Additionally, on March 7-10, 2025, Defendants attempted to trick Plaintiffs' into waiving any and all discrimination claims Plaintiffs 'may have against defendants by entering into a conditional a Confidential Settlement Agreement and Release;

86. The conditional Confidential Settlement Agreement targeted the predatory Lease Agreement dated July 15, 2023, overdue rent in the amount of $12,320.00, late fees, storage and other incidentals for November 2024 through February 2025 but provided that Plaintiffs' had to enter into a new predatory lease agreement beginning February 1, 2025 through January 2026 and pay a monthly rent of $3,080.00 plus incidental by March 4, 2025 and waive any and all claims against defendants;

87. Although all parties signed the Conditional Settlement Agreement, Plaintiffs' did not enter into a new lease agreement;

88. THE HATCHERY, CHICAGO Joint Venture holds monthly Zoom recorded Townhall Meetings and residents use this process to voice their concerns which are ignored;

89. When West Side resident/tenants do not receive priority access to the all of the offerings at THE HATCHERY, CHICAGO Joint Venture and begin to complain or propose solutions, their residency is terminated, they are banned from THE HATCHERY, CHICAGO Joint Venture and a law firm begins collection proceedings against them;

90. Aspiring food and beverage entrepreneurs like Plaintiffs, who outgrew their kitchen space and lacked the capital to pay for a full buildout of a storefront or warehousing facility were "constructively evicted" by THE HATCHERY, CHICAGO Joint Venture because they complained about discriminatory practices and the lack of support with helping them secure affordable space in which they could further incubate their ideas;

91. When tenants of color complained of unfair practices, they were deemed to be "the problem" and were systematically terminated without notice or explanation from the program and barred from entering the facility;

92. For example, without notice or explanation, THE HATCHERY, CHICAGO Joint Venture terminated six (6) African American owned small businesses who complained of unfair and discriminatory treatment such as (1) Big Momma Kitchen & Catering, (2) Coco Chili Catering, (3) Mr. E Chef Catering, (4) Cooking for the Soul Catering, (5) Work the Faith Catering and (6) Sweeter Redemption Catering and they were all banned from entering the building again;

93. African American employees who complain about discriminatory practices are also deemed a problem and are terminated without notice or explanation and banned from the building like Derrick Lyons, the Kitchen Attendant, Cortney _____, Custodian, Laton Darius Williams, Building Engineer, and Moncy Smith, Security;

## 8. RACIALLY MOTIVATED TORTOUS INTERFERANCE WITH PLAINTIFFS' LEGITIMATE BUSINESS EXPECTANCY: BUT FOR PLAINTIFFS' RACE, PLAINTIFFS' WOULD NOT HAVE BEEN REMOVED FROM THE BLACKHAWKS VENDOR LIST

94. Plaintiffs' held private property rights and reasonably expected legal entitlement to be placed and remain on Blackhawks Vendor List which would allow Plaintiffs to own and control certain physical and intangible assets of a food service business;

95. Because Plaintiffs complained about discriminatory policies and practices, in retaliation, CEO Natalie Shmulik removed Plaintiffs from the Blackhawks vendor list because of Plaintiffs' race, causing severe economic harm to Plaintiffs;

96. White staff members who spoke up for Plaintiffs and other West Side tenants were either removed from meetings or terminated;

97. For example, when Dani Zuchovicki brought discriminatory issues to defendants, she was told her comments were too negative and THE HATCHERY, CHICAGO Joint

Venture requested her to stop conveying negativity and she replied "I was stating facts";

98. Naihal Wajid, complained about THE HATCHERY, CHICAGO Joint Venture 's racially discriminatory practices and noticed that event space---although located in the heart of a historically under resourced area---were predominantly used by white owned and operate businesses rather than by community residents despite THE HATCHERY, CHICAGO Joint Venture receiving large grants to include local minority owned businesses;

99. Defendants' engaged in a policy and practice of dismissing or forcing African American residents out of THE HATCHERY, CHICAGO Joint Venture without explanation;

100. For example, in December 2022, defendants dismissed six (6) African American business residents without explanation and banned them from entering the building;

101. African American tenants and employees are expelled from THE HATCHERY, CHICAGO Joint Venture without explanation on a regular basis and are not allowed to re-enter the building;

102. Defendants received numerous detailed letters from former employees of The Hatchery outlining discriminatory conduct, but they were ignored with no follow-up or offers of assistance;

9. **RACIALLY MOTIVATED TORTOUS INTERFERANCE WITH PLAINTIFFS' LEGITIMATE BUSINESS EXPECTANCY: BUT FOR PLAINTIFFS' RACE, PLAINTIFFS' POP-UP-BRUNCH WOULD NOT HAVE BEEN CANCELLED AT THE LAST MINUTE.**

103. Dani Zuchovicki concluded that over time, the benefits and discounts offered by THE HATCHERY Joint Venture were not good for minority owned businesses and she complained to CEO Natalie Shmulik and THE HATCHERY'S Board, but they were not interested in what she had to say;

104. Dani Zuchovicki told THE HATCHERY executives that their discriminatory conduct did not align with its mission to exclusively support entrepreneurs from the

16

West Side of Chicago with the tools, resources and access to affordable and discounted services, but she was routinely ignored;

105. Dani Zuchovicki worked with Plaintiffs in 2019 to obtain the required training and paperwork they needed to move forward and take advantage of the programs offered by THE HATCHERY, but she was met with continuous resistance;

106. Despite the efforts of Dani Zuchovicki to help Plaintiffs, Plaintiffs were constantly met with resistance to get into a shared kitchen and THE HATCHERY continuously deemed Plaintiffs' "not ready" although they had earned the required paperwork;

107. THE HATCHERY Joint Venture explanation that Plaintiffs' were "not ready" was a mere pretext for racial discrimination and exclusion;

108. THE HATCHERY and ICNC Joint Venture repeated this discriminatory behavior for years, against Plaintiffs and especially against African American tenants and employees from West Side communities;

109. Dani Zuchovicki told THE HATCHERY Joint Venture that continued comparison of some its West Side tenants with its more affluent and white tenants who were dissimilar in every aspect was unfair because it resulted in treating white and affluent tenants more favorably because of their race and their wealth;

110. THE HATCHERY and ICNC Joint Venture staff made discriminatory exceptions and broke rules when it came to white and affluent tenants;

111. In the Fall of 2023, Plaintiff submitted a proposal to host a Pop-Up Bruch in which defendants gave the green light;

112. On November 7, 2023, Dani Zuchovicki, Membership & Community Manager, sent Plaintiffs an email which stated "Hi Taj, Our team reviewed the contract and pricing questions you listed below and determined that everything is correct. To move forward with the event given that it is this Saturday, November 12…Additionally, if the event description does not meet our requirements to help your grow (i.e. client tasting, rebrand, culinary class, or business meetings)we will not be able to host …);

17

113. Plaintiff responded by stating "So allow me to make a call to Jamy to inform him of this information;

114. On November 8, 2023, less than 24 hours later, Dani Zuchovicki, Membership & Community Manager, sent an email to Plaintiffs' which states "Good morning Taj, "Due to the lack of response regarding your event description and closeness to the event, we are unable to host you. Please let me know if there if there is anything we can do in in future";

115. Plaintiffs responded via email "Hi Danny, Are you aware that I have taken a job as a High School instructor Now. Which means I'm not able to respond to emails as fast…. Can you explain to me what is considered personal and what is not? But I do know that Jamy has been in the building…";

116. Dani Zuchovicki, Membership & Community Manager, responded and stated in part: "….sorry he was [not] included sooner, based on the emails below the correspondence was with your email only. You're right, I totally forgot about your amazing new….;

117. Dani Zuchovicki, Membership & Community Manager, also stated: "That's helpful to know. Could you please share more about this, possible share with us a run of show and general overview of the brand concept. All matters in this email will be confidential"

118. In response, Plaintiffs' stated: "If I had to be honest I don't TRUST to share my Business concept with you at this time. However, of the concept is successful then we can sit down and further discuss it. This is not a commercial event this is a CTRL Kitchen event. The most I can give you is this is a Ticketed Pop Up Bruch. We have a Client and Business Relationship. I have shared some things before, and it became An idea for the entire Hatchery, and this is not nothing for other brands. But if you need anything further please reach out to Jamy. I have to get back to work.;

119. Dani Zuchovicki, Membership & Community Manager then stated: "I'm kind of lost because myself and Christian which is our catering Director had a meeting with

18

John Claude and we went over the brunch with them and they said everything looks to be in order and that's why I'm lost because I thought everything was taken care."

120.    Steve DeBretto in a separate email wrote: "Below you wrote: "I have shared some things before, and it became An idea for the entire Hatchery, and this is not nothing for other brands". Can you please give me more details on what you mean by that? I'd like to know what your previous idea was and what happened to it";

## 10. RACIALLY MOTIVATED TORTOUS INTERFERANCE WITH PLAINTIFFS' LEGITIMATE BUSINESS EXPECTANCY: BUT FOR PLAINTIFFS' RACE, DEFENDANTS WOULD NOT HAVE INTERFERED WITH THIS PRIVATE PROPERTY RIGHT

121.    Plaintiffs learned that THE HATCHERY, CHICAGO Joint Venture did not want African Americans applicants from the West Side community inside THE HATCHERY joint venture facility which is inconsistent with its mission;

122.    THE HATCHERY, CHICAGO Joint Venture would always reject any ideas or proposals which called for African American and West Side consumers visiting the facility;

123.    Plaintiffs' proposed the idea of adding a patio to The Hatchery Chicago to generate revenue, but that idea was rejected as were all of Plaintiffs' ideas that involved opening the facility to the minority consumer;

124.    In 2020, Plaintiffs' suggested that CEO Steve DeBretto hold a diversity and inclusion meeting for staff, but that idea was rejected;

125.    THE HATCHERY, CHICAGO Joint Venture made little effort to make space accessible for local gatherings;

126.    In some kitchen competitions, participants who were white, affluent or already well-resourced received more favorable consideration than community-based residents who were held to stricter standards and faced penalties or removal for certain issues;

19

127. THE HATCHERY, CHICAGO Joint Venture made no efforts to create competitions specifically for West Side entrepreneurs, and community-based residents contrary to the organization's stated purpose;

## 11. RACIALLY MOTIVATED TOUROUS INTERFERANCE WITH PLAINTIFFS' LEGITIMATE BUSINESS EXPECTANCY: BUT FOR PLAINTIFFS' RACE, PLAINTIFFS WOULD NOT HAVE BEEN EXCLUDED FROM THE HATCH MADE MEALS PROGRAM

128. Shanell Rainey supervised the Impact Program and was over the Hatch Made Meals Program and she was forced to quit after she complained of discriminatory practices;

129. In 2023, Plaintiffs' were constantly excluded from being placed in rotation for "Hatch Made Meals", a program that allowed business residents to generate considerable business income;

130. Plaintiffs generated approximately $25,000 every two weeks from Hatch Made Meals before they were removed;

131. In 2024, Plaintiffs' were promised that they would be in rotation for "Hatch Made Meals", to keep their business afloat but that never happened;

132. On August 21, 2024, Plaintiffs' were advised by Steve DeBretto (CEO) that they would be in rotation for Hatch Made Meals but was conditioned was conditioned on Plaintiffs' making rent payments by the 1st of each month, a condition not placed on affluent and white owned business residents who participated in Hatch Made Meals;

133. On August 24, 2024, CEO DeBretto reassured Plaintiffs' they would remain in rotation for Hatch Made Meals if they paid rent on time but that was a mere pretext to discriminate against Plaintiffs' based on their race;

134. On October 8, 2024, Plaintiffs' sent an email to CEO DeBretto requesting an explanation why they were being excluded from Hatch Made Meals;

135. Plaintiffs' stated: "Hi Steve & Natalie, We were just informed by Dana that we are not in HMM meals again this year! How is this possible? We have an email stating that we start HMM on October 13th-October 26th. We never received any communication that we will not be a part of this program until next year. Myself and

20

Jamy need answers about this matter. The last conversation I remember is with Steve stating that we need to be up to date on our rent."

136. On October 8, 2024, Plaintiffs' received an email from CEO DeBretto claiming that Plaintiffs' were taken out of rotation by "mistake" and "without notice" but using failure to pay rent on time as a pretext for racial discrimination and informing Plaintiffs' they would not be placed back into rotation for the Hatch Made Meals program for the remainder of 2024, causing Plaintiffs' to lose $50,000 a month in business income;

137. On October 10, 2024, Steve DeBretto wrote: " Hi Taj, Of course. I hope your phones get back online soon. Basically, I made a mistake. I committed to keep you on the HMM rotation, which we will do. But I did not realize when I spoke to you and Jamy that we had already taken you off of the October rotation. We should have given you notice of that, and I'm sorry that we did not."

138. Steve DeBretto went on to write: "The reason we removed you from the October distribution was because of the late payment issues over the course of this year that we discussed in person when we met. We did that before our conversation, and I should have let you know. Again, I'm sorry, and I understand that you were anticipating those orders. We will have you on the rotation as soon as we can, but as you know, Dana's already booked out the rest of 2024 so it will be after the new year."

139. In response, On October 10, 2024, Plaintiffs' responded "Hi Steve, Our phones are currently not working at the moment! Can we communicate via email?

140. On October 16, 2024, Plaintiffs' sent CEO DeBretto an email expressing "disappointment regarding the recent changes to [their[ participation in the Hatch Made Meals program";

141. The discriminatory removal of Plaintiffs' from the Hatch Made Meals program without notice or valid reason caused "significant disruptions' to Plaintiffs' business and caused Plaintiffs' to lose business opportunities because they turned down other business opportunities in anticipation of income being generated from the Hatch Made Meals program;

21

142. Plaintiffs were never compensated by defendants for the expenditures incurred in purchasing supplies and preparing food in anticipation of fulfilling their commitment to the Hatch Made Meals program;

143. On October 16, 2024, Plaintiffs' received an email from Steve DeBretto which stated: "Hi Taj, I appreciate the additional information you've given me. As I let you know last week, I'm sorry for any disruptions caused by removing you from the schedule. We're happy to keep you on the schedule for after the new year, but there's not an opening before then. I'll ask that Dana keep you in mind for any cancellations. Thanks, Steve";

144. On October 16, 2024, In response, Plaintiffs' wrote: "Dear Steve, I hope this message finds you well. I am writing to express my disappointment regarding the recent changes to our participation in the Hatch Made Meals program. After our conversation in August, where you reassured us on August 21, 2024, that we would remain on the rotation for Hatch Made Meals, we were surprised to learn that we have been removed from the list for our scheduled date on October 14th. It appears that this decision was made by you and Natalie, but we have not been informed about any changes that led to this outcome. This situation has caused significant disruptions for us. Both Jamy and I turned down other business opportunities to ensure we could accommodate the Hatch Made Meals program. We even went as far as purchasing supplies and preparing food in anticipation of fulfilling our commitment. Also staffing was impacted. This unexpected alteration has truly impacted our business, and we would appreciate our Hatch Made Meals before the 2024 year is out. Thank you for your attention to this matter. I look forward to your prompt response. Sincerely, Taj Savage-Franklin CEO  CTRL Kitchen LLC/ J Spice";

145. On December 15, 2024, John Claud Ruder sent Plaintiff a "Letter of Support" which outlined several instances of "racist micro and macro aggressions from Management, particularly when referencing the surrounding neighborhood and neighbors";

146. On December 15, 2024, John Claud Ruder sent a letter of Support for Plaintiffs' which states in part:

   a. I worked at The Hatchery and ICNC from September 2023 to March 2024 as the Event and Community Coordinator;

   b. One of the first event requests I received during my training period was from Ctrl Kitchen. They wanted to host a launch party in the form of a brunch for their new branding and marketing strategies;

   c. After getting it confirmed with my manager, other supervisors voiced their concerns about the event potentially being for personal reasons rather than for business;

   d. I was told to get further clarification on his intended use of the space, so I emailed Jamy asking for more detail;

   e. This was one of two tenant events that had a notable level of scrutiny, both being Black owned business;

   f. Ultimately, Jamy's event was cancelled due to the signed contract not being returned in time. He wasn't notified the event would have to be cancelled until a few days before the event day;

   g. Though the event was cancelled because of the contract, there were a lot of underlying tensions between the Hatchery, A4CB and CTRL Kitchen. This was especially felt in the aftermath of canceling;

   h. Jamy was particularly worried about the impact on the customers he had to cancel on and the financial implications of canceling an event in the final stages of planning it;

   i. To my knowledge, the conversations surrounding the canceling of his event did not take into consideration what it would mean for CTRL Kitchen and its success;

## 12. RACISTS COMMENT FROM MANAGER REFERRING TO AFRICAN AMERICANS AS COLORED

   j. Throughout my time at the Hatchery, there were multiple instances of racist micro and macro aggressions from management, particularly when referencing the surrounding neighborhood and neighbors. One instance that stands out was when an ICNC manager referred to a black woman as "colored" in a meeting with sponsors and other employees. All employees in the meeting stayed silent, including myself;

   k. HR was made aware of this during my off-boarding process. Though this is separate from the cancelled CTRL Kitchen event, it may provide insight into the distrust between the Hatchery and its members;

   l. Pejorative language and micro aggressions undermine community efforts and reveal a lack of care. They undermine The Hatchery's mission;

23

**13. RACIALLY MOTIVATED TORTIOUS INTERFERENCE WITH PLAINTIFFS' BUSINESS EXPECTANCY: BUT FOR PLAINTIFFS' RACR, PLAINTIFFS' EXCLUDED FROM PARTICIPATING IN THE FANCY FOOD SHOW**

147. Plaintiffs future business opportunities and expectations were reasonable and not merely wishful thinking;

148. In December 2024, Plaintiffs' event was cancelled without reason causing Plaintiffs' to lose $5,525 in Bruch ticket sales, $2,600 in food items from Hatch Made Meals, and over $300,000 in loss business from long-term cliental who vowed not to do business with Plaintiffs anymore because of the cancelled event;

149. Defendants made it difficult for Plaintiffs to use THE HATCHERY, CHICAGO Joint Venture to grow and develop their business ideas while white residents maintained long term business relations with THE HATCHERY, CHICAGO Joint Venture even while living abroad and running their business operations from THE HATCHERY, CHICAGO Joint Venture;

150. Plaintiffs operated one of the top catering services at THE HATCHERY, CHICAGO Joint Venture and because of their race and without notice, Plaintiffs were:

a) Removed from preferred catering lists;
b) Denied from participating in the "Fancy Food Show" under the pretext that Plaintiffs' had not completed the required classes when in fact they had completed the required classes;
c) Denied the opportunity to develop their business ideas to generate new business income;

151. Defendants continued to sabotage, blackball and charge Plaintiffs with hidden fees until it became so unaffordable that Plaintiffs were forced to move and relocate their business;

24

**14. PLAINTIFFS' CONSTRUCTIVELY EVICTION FROM THE HATCHERY, CHICAGO BECAUSE OF RACR**

152. Plaintiffs vacated the premises because of THE HATCHERY joint venture seriously interfered with Plaintiffs ability to conduct business at The Hatchery Chicago for intended purpose;

153. THE HATCHERY joint venture actions created a hostile and discriminatory environment which was sever enough to be considered a constructive eviction;

154. On June 10, 2022, defendants' caused Plaintiffs' to lose $10,000 in revenue for one event and refused to talk to Plaintiffs and provide them with an explanation;

155. On November 21, 2022, Plaintiffs received an email from Bob Climack, CFO of THE HATCHERY, CHICAGO Joint Venture which in part states: "Hi Taj/Jamy, You must pay $4,042.88 by November 30th, to avoid a holdover rate (double rent) for November and December. You must vacate the premises by 12/31/22;

156. In response to Bob Climack's email, Plaintiffs' wrote: "Is this necessary?"

157. On November 22, 2022, Plaintiffs' responded to defendants and wrote: "I would still like to meet as well! We truly don't want to give up any more money until we have a clear understanding to what we are doing because I spoke with Jamy and we do not want to leave the hatchery";

158. On November 26, 2022, Plaintiffs' wrote in part: "…we are asking for a meeting with Steve and Brad. So, before we give any more money, we need to have a clear understanding to what is going to happen next. As I stated before we do not want to leave The Hatchery right now, so we are not saying that we won't pay but we just need a clear understanding;

159. On November 28, 2022, Plaintiffs requested a face to face meeting;

160. On November 30, 2022, Steve DeBrettoo sent Plaintiffs' an email which stated: "Hi Taj and Jamy, Thank you for the conversation this afternoon. As we discussed, we look forward to receiving financial projections (monthly revenue and expenses detailed in a profit and loss format for the next 13 months, as well as a monthly cash flow projection) by Monday, December 5th at 5 p.m. We'll review those on Tuesday

and will respond quickly with a recommendation on kitchen space starting January 1st, to assist you in your business planning;

161. Additionally, Steve DeBretto stated: You also said that you would pay December rent as you continue to use the kitchen. Since you are in holdover status on the lease that expired on October 31st, rent of $1,750 is due on December 1st, so please pay that now. Also please propose by what date in December you will pay the rest of your balance and include those costs in the P&L / cash flow projections for December.

162. Additionally, Steve DeBretto wrote I also reviewed our past emails and on November 11th you said that you would pay your full balance by November 20th and in return we would have given you a $5,000 discount. That didn't happen, and I'm not sure whether we are able to make a similar offer again, so please do not include that in your calculations. I'll be happy to revisit the possibility of a discount on paying your balance after we receive December's rent and your financial projections. Best regards, Steve";

## 15. <u>PLAINTIFF REQUESTED TO PROVIDE PROFIT AND LOSS STATEMENT AND FINANCIAL PROJECTIONS</u>

163. On January 21, 2020, November 30, 2022 and May 10, 2022, Defendants requested that Plaintiffs provide them with Profit & Loss Statements and Financial Projections in which Plaintiffs' complied;

164. On December 5, 2022, as promised and requested, Plaintiffs' sent Steve DeBretto their 2023 Profit and Loss Projections;

165. In 2020, Plaintiffs' generated $157,000 in income;

166. In 2021, Plaintiffs' generated $139,000 in income;

167. In 2022, Plaintiffs' generated $84,825 in income;

168. In 2023, Plaintiffs' generated $306,000 in income

169. In 2024, Plaintiffs' were projected to generate $500,000 in income

170. In 2024, Plaintiffs' generated $201,316 in income;

171. Plaintiff generated approximately $25,000 every two (2) weeks in Hatchery generated meals;

26

172. In 2019, Plaintiffs operated from shared kitchen space;

173. In 2020, Plaintiff signed a 12-month lease agreement;

174. In 2021, Plaintiff signed a 12-month lease agreement;

175. In 2022, Plaintiff was forced to sign a six (6) month lease agreement (January to June of 2022) and from July 2022 to January 2025;

176. Plaintiffs' projections for six years of $22,550,000 is as follows:

     a. $150,000 for 2019;

     b. $400,000 for 2020;

     c. $800,000 for 2021;

     d. $1,600.000 for 2022;

     e. $3,300,000 for 2023;

     f. $6,4000,000 for 2024;

     g. $10,000.00 for 2025.

177. THE HATCHERY joint venture knew with certainty or substantial certainty that canceling Plaintiffs' events and excluding Plaintiffs' from food programs would cause injury to Plaintiffs;

## 16. RACIST COMMENT FROM CEO REFERRING TO PLAINTIFFS' CHILDREN AS "CUTE LITTLE MONKEYS"

178. On one occasion in December 2023, Plaintiff saw CEO Natalie Shmulik in the lobby of THE HATCHERY and Natali said to Plaintiff "how's the baby, I have not seen them in a while, aren't they cute little monkeys" and Plaintiff reported the offensive incident to Una, chairman of the board, but Una did nothing about it;

179. On January 4, 2024, Plaintiffs' received an email from Bob Climack, CFO, of The Hatchery, Chicago Joint Venture which states: "As you know, your lease ends at The Hatchery on January 1, 2024. At this point in time, we do not plan on offering you a renewal for another year term. As you search for a new space, we're willing to extend your current lease to July 31th, 2024. This is the latest you will be allowed to operate

27

out of The Hatchery. We will also include a 60 [day] early termination clause with no penalty";

17. **THE HATCHERY, CHICAGO PROPOSED NEW LEASE ON A TAKE IT OR LEAVE BASIS AFTER BREACHING ALL ITS PROMISES AND DUTIES OWED PLAINTIFFS', INCLUDING PLAINTIFFS' REASONABLE BUSINESS EXPECTANCIES**

180. Plaintiffs vacated the premises because of THE HATCHERY joint venture serious interfered with Plaintiffs ability to conduct business at The Hatchery Chicago for intended purpose;

181. On January 19, 2024, Plaintiff agreed to extend their lease until July 31, 2024;

182. On January 22, 2024, Robert Climack wrote: "…Unfortunately, at this moment, we cannot renew your lease due to your balance of $9,340.00. Can you let me know your plan to pay that down?";

183. Plaintiffs disagreed with Robert Climack and on January 22, 2024 wrote: " I just checked our account and we are not behind $9,340.00. November rent was paid! We were only behind in December and January. I just made a payment for 3,080 so we should only be behind now for the Month of January…";

184. On January 23, 2024, Robert Climack replied: "It looks like my number was an error. Terribly sorry for the scare…";

185. On Monday, April 24, 2024, Plaintiffs' received an email from Bob Climack, (CFO) which stated " Jamy/Taj, Hope all is well. I wanted to circle back regarding your past due balance. Combined, your account total about $8,000 past due. Rent will be come due for May so it's only going to increase a few thousand dollars. I'm doing my best to work with you all and give some grace as you all ramp up for the summer, but we have policies and procedures to adhere to, in which we hold all tenants to. With this balance, and irregular payments, we will have to end your month-to-month lease if it's not taken care of."

186. On October 8, 2024, Plaintiffs reported the discriminatory conduct to Unah Choi, President of the Board of Directors but was told "I can't talk about it";

28

187. Plaintiffs' received an email from Bob Climack, Chief Facilities Officer (CFO) which stated in part that: "I wanted to let you all know that I will be leaving ICNC/Hatchery for another opportunity and …..Before I leave, I wanted to close the loop and address your request to meet Unah, the board chair. Unah intends on meeting with you both to discuss HMM or any of your other concerns, but she would like to have a Hatchery team member present. CC'ed here is Monique. Monique will pick this up in my absence and work with you both and Unah on facilitating a group meeting" n

188. On January 15, 2025, Plaintiff were contacted by Monique Kilgore, Director of Operations, to facilitate a meeting with Unah;

189. On February 1, 2025, Plaintiffs' signed a 12 month contingency lease agreement with a base annual rent of $3,080 a month, a monthly storage fee of $80/dry, $100/cold, $100/freezer and $25/cage plus costs for heat, air conditioning, electricity, common area maintenance and real estate taxes and a security deposit of $2,600 plus $300 a month for small kitchen storage and an administrative charge of $100 per month or 2% per month late fee, whichever is the highest, plus a $200 move-in fee and $100 fee for painting ceiling (See Attachment);

190. Many affluent, white and corporate businesses are not required to sign lease agreements;

191. After the meeting, on February 12, 2025, Monique Kilgore sent Plaintiffs' an email stating in part that the" HMM contracts you missed in October 2024 due to miscommunication were valued at approximately $25,000 and since these contracts were for Ctrl Kitchen to provide meals, the amount reflected gross revenues rather than lost profits";

192. In addition to the continuous pretextual excuses as reflected in the February 12, 2025 email, defendants made self-serving statements that Plaintiffs' rejected future HMM contracts and proposed to give Plaintiffs' six months of rent credit, a one-year lease extension at the same discounted rate of $3,080/month effective February 1, 2025, and application rent credits;

193. On February 20, 2025, however, when Plaintiffs' inquired to apply the six-month rent credit to March and Aril 2025, rather than spacing it out to the end of the lease, defendants rejected Plaintiffs' compromise;

194. **On February 22, 2025, Plaintiffs' received an email from Robert Climack which stated:** "Hi Taj and Jamy, Thanks for jumping on a call the other day. To recap:

- CTRL will pay January rent in the coming days
- CTRL will pay new rent charges (MARCH) in time (by 3/5/24)
- CTRL will need a little more time to catch up on the Feb rent, but may have it paid off by the time the April rent statement comes out
- Can you give us periodic updates on when you think this will get cleared?
- CTRL will pay $500 to their FC balance in the coming days

195. Robert Climack also wrote: "Does this all sound about right? If so, can you please let me know what "coming days" means as far as a date for the past due Jan rent and FC balance? As you know, we sent out an email recently about requesting your exit by the summer and that we are not offering a lease renewal. In speaking with Jamy recently, that's terrible timing due to summer fests, so we verbally agreed to allow you all to stay until Jan/Feb of 2025. One of the primary reasons for not renewing this lease is the history of past due payments. Unfortunately, a balance is growing again. Due to you having a balance now, we will not be entering into another lease with you but will keep your lease month-to-month. The way that works, is either party can give a 30-day notice to vacate. If your balance continues to grow, we will have no choice but to act on this."

196. Robert Climack also wrote: "Lastly- during our chat you all mentioned cash flow issues in January/February and how it happens yearly. Would you all be willing to meet with our business advisor, Major Purnell, to discuss this and review your finances with him? Major is great at his job and an all-around great guy! Let us know if you have any questions."

197. On February 27, 2025, Defendants offered Plaintiffs a compromise of a one-year lease effective February 1, 2025 through January 31, 2026, with past due rent for November-December 2024 and January-February 2025 forgiven, plus an additional two months of rent credit to be taken the last two months of the new signed lease. The

last communication we sent to you was that we could not accommodate your request to apply rent credits in March and April 2025 instead of at the end of the new lease……but if we do not hear back from you by Friday, February, 28 at 5 p.m., we will have to withdraw our offer and take steps to reclaim the space"

198. On February 27, 2025, Plaintiffs' offered another compromise to defendants' proposal but that was rejected by defendants on February 28, 2025;

199. Finally, on March 3, 2025, Plaintiffs accepted defendants offer of paying 50% rent in June/July and 50% in December/January and the parties continued to negotiate until they reached a final resolution on March 10, 2025;

200. However, defendants retaliated against Plaintiffs' by excluding them from all events sponsored by The Hatchery, Chicago Joint Venture making it impossible and impractical for Plaintiffs' to remain in a commercial lease agreement with defendants;

201. Defendants made it impossible for Plaintiffs' to pay rent and operate a profitable business;

202. On June 4, 2025, Plaintiffs' requested a meeting with the new CEO of The Hatchery, Chicago Joint Venture but were told they had to settle their balance in full before having such a conversation;

203. On numerous occasions Plaintiffs attempted to find solutions to the mistreatment and discrimination they experienced but were ignored;

204. Because Plaintiffs' operated one of the top catering services out of The Hatchery Chicago, Joint Venture defendants continue to use their image and likeness on its website;

205. The defendants' mission statement does not reflect the realities of its operation;

206. Plaintiffs' had no choice but to move from The Hatchery Chicago, Joint Venture;

207. On August 5, 2025, Plaintiffs' received an email from Monique Kilgore, Director of Operations confirming that Plaintiffs' moved out of The Hatchery Chicago, Joint Venturn;

208. More specifically, On August 5, 2025, Monique Kilgore, Director of Operation wrote to Plaintiffs': "It looks like CTRL Kitchen has moved out of The Hatchery,

31

Chicago Joint Venture. After you mentioned to a Hatchery staff member on July 28 that you were moving out, video footage from July 29 shows you removing everything from C-102 and most things from your storage. The only remaining CTRL Kitchen items at The Hatchery as of today are:

- A package of buns and 3 fast food cups in C-102;
- Two speed racks in a cold storage unit (one with some food and one with; empty trays)
- Some food on top of and in a Hatchery-owned cage in the cold storage unit;

209.    Monique Kilgore also wrote: "Please confirm that you have moved out of C-102 and if you intend to pick up the trays/food. Of course, we also need you to return your keys/fob;   n

210.    Plaintiffs are now denied access to The Hatchery Chicago, Joint Venture and are not allowed to remove the remainder of their property or to pick up their mail;

211.    On August 5, 2025, Plaintiffs' requested that The Hatchery Chicago, Joint Venture stop communication with them and in response, the Hatchery Chicago retained Attorney Laura Boggioni and Kovitz Shifrin Nesbit who contacted Plaintiff to advise them that after August 11, 2025, all mail would be returned to the sender;

212.    More specifically, On August 5, 2025 Plaintiffs' wrote an email which stated in part: "…given the strained nature of our relationship with the Hatchery, Chicago Joint Venture Jamy and n would prefer that you no longer contact us directly. We would like to reiterate our disappointment regarding your refusal to facilitate a meeting with Maria, the new CEO of the Hatchery, when we requested it on June 4th. Your condition that we settle our balance in full before having a conversation with her felt more like a personal affront than a professional approach to resolving issues";

213.    Plaintiffs' further wrote : "CTRL Kitchen has, on numerous occasions since becoming members in 2019, attempted to find resolution for the mistreatment and discrimination we have experienced. This includes instances detained in letters from former employees. Despite our meeting with you and Una, nothing was resolved, and

32

there was no follow-up to check on us or offer assistance. It is also ironic that our picture remains on your website, accompanying a mission statement that, in our experience, does not reflect the reality of operations. Regarding the items mentioned in your email, we confirm that we have moved out of C-102. We will arrange to pick up the remaining trays and food no later than Monday, August 11th.Please be aware that we may still have packages and mail directed to The Hatchery that will need to be picked up":

## 18. THREATS AND INTIMIDATION BY DEFENDANTS' LAWYERS AFTER PLAINTIFFS' WERE CONSTRUCTIVELY EVICTED

214. On August 21, 2025, The Hatchery lawyers emailed Plaintiffs and stated that:

"ICNC has learned and documented that CTRL kitchen transacted business on The Hatchery property around 13:30 a.m. on August 19, 2025. This conduct constitutes trespassing. CTRL kitchen and its employees are not permitted to access The Hatchery or be anywhere on ICNC property and your staff must refrain from coming onto the property again"

215. On September 5, 2025, Plaintiffs' received an email from Attorney John Pradick stating that he has been retained by ICNC The Hatchery for the purpose of pursuing the past due amount of $25,377.35 as of 9/2/2025 and stating that "please note that a decision to pursue other remedies is being made at this time.

216. Attorney Pradick also stated that "It is my client's expectation to get an investigator on sight or sights, depending on what they uncover, and to identify & document various assets, company vehicles, vin numbers, etc. In addition to your personal guarantee, the investigators are expected to attempt to identify and speak with as many: UCC holders, creditors, vendors, banks, and property managers to gather information".

217. Plaintiffs lease was constructively terminated by THE HATCHERY joint venture and Plaintiffs should be released from their obligation to pay for rent because defendants interfered with Plaintiffs use and enjoyment of the property and its programs;

33

19. PRIORITY & FAVORITISM TO WHITE OWNED, CORPORATE & AFFLUENT BUSINESS OWNERS AND DRIVES MINORITY OWNED TENANTS/RESIDENTS OUT OF BUSINESS.

218. THE HATCHERY, CHICAGO Joint Venture gives priority and favoritism to affluent and white business owner, non-West Side individuals and companies and non-community-based residents that are not aligned with its mission;

219. Maison Cuisine, a white owned business, is allowed to operate from THE HATCHERY, CHICAGO Joint Venture while the owners live in California;

220. As stated above, MARY FRAN RILEY, a white female, is Director of Community Relationships for A4CB, and her son, NICK FRAN MAGGIOIS is the Lead Sales & Event Manager for Maison Cuisine; and NICK is treated more favorably than Plaintiffs' and other minority owned-business tenants/residents because he is given free access to facilities which minority business owners must pay for;

221. For example, Laines Bake Shop was a minority owned business tenant/resident that had a contract with Whole Foods but was run out of business. Defendant allowed white owned companies to do build-outs to accommodate their growing business; but when Laines Bake Shop attempted to expand by installing a $10,000 industrial over, Defendant said no, thereby causing her to lose her contract with Whole Foods and go out of business;

222. THE HATCHERY, CHICAGO Joint Venture gives priority and favoritism to affluent and white owned companies, non-West Side individuals and companies and non-community-based residents that are not aligned with its mission;

223. THE HATCHERY joint venture imposed different terms based on race which created a hostile environment for Plaintiffs and other similarly situated tenants;

224. White owned businesses that were treated more favorably by The Hatchery includes:

**a. Kooshy Croutons**

- We're given more Access to facilities than minority owned business;

- They really didn't follow the rules and there was no repercussions, they would book one station and use more than one oven at a time, but minority owned businesses we're only allowed to use what is at that station;
- They would use the packaging room without booking;
- Chapin allowed them to do whatever they wanted;
- They we're allowed to use rooms without charge;

### b. Chef Aram Reed

- He just would do whatever he wanted;
- He was very rude and disrespectful to minority tenants;
- He stated that the office told him to screen certain tenants (Zella Rose);
- His kids were allowed to be in his kitchen ( she was a newborn);
- He lives in Costa Rica while minority residents/tenants we're required to reside in the area;
- He bought in Jessica and they let her  share a kitchen under Aram Reed without any paperwork and at no cost;
- They put Jessica and Rachel from Bartlebys in a large private kitchen for $750 each;

### c.  Maison Cuisine

- Was always awarded  the different Grants;
- Was chosen first for all the  different catering events (mainly corporate);
- Plaintiffs' wanted to host a class in the shared kitchen and were told no but a few weeks later they allowed Maison Cuisine to host a cooking class with ingredients;
- Plaintiffs' asked for a storage closet and were told because it was only for corporate clients, but Maison Cuisine had one.
- She lives out of state (California)
- They never have to book for they tastings, but minority businesses did and were told no;
- They don't have to pay for they storage for the tasting furniture

### d. Latin Plate

- They were  always chosen for special events over minority owned businesses;
- They owed a lot of money, never paid and were not legally threatened and pursued by defendants' lawyers
- They were awarded a lot of grants over minority owned business;

### e. White Owned Businesses That Paid Less Rent Than Plaintiffs':

- Justice of the Pies
- Jessica
- Bartlebys
- Five Squared Pizza

### f. White Owned Businesses Who Did Not Meet Residency Requirements

- kellogg
- reef kitchen
- ingredion
- synergy
- Maison Cuisine
- Chef Aram Reed

35

- Unibar
- Land Lovers (Asian)
- RX Barn
- Kororin (asian)
- Pixie Dust Salts
- present tense bar
- it's a pop co (Salad Club Sarah)
- Leto Foods
- Nine Times Bakery
- Five Squared Pizza
- Unibar
- Carolyn Krisps
- Fueled By AF
- Moody Teas
- Dilly Dally Provisions
- Route 66 (Food truck)
- Katie n's Catering
- Wendy'sn
- ChilieOil (Asian)
- Mother Prepper ( Hispanic) ( The reason Laton lost his job)
- Masa Madren
- Zimt Bakery

### g. White Owned Companies That By-Passed Admission Process:

- Pluck It (This is the company that Chapin Conner was dealing with under the table)
- Jessica

### h. Other Companies That Received Favoritism & Priority Over Plaintiffs and Other Minority-Owned-Businesses:

- Maison Cuisine
- Dilly Dally
- Reef Kitchen ( Had multiple coolers and storage spaces which left it limited to the rest of the tenants)
- Pig & Fire (released from lease)
- Laos to your house (allowed them to no New year events)
- RX bar had a special kitchen built out

225. On several occasions, THE HATCHERY joint venture gave Plaintiffs' excuses of "mistake" for excluding them from business opportunities which were mere pretexts for intentional racial discrimination in commercial lease agreements;

226. THE HATCHERY joint venture engaged in conduct that destroyed prospective contractual and business relationships that were of pecuniary value, destroyed Plaintiffs opportunity to obtain prospective customers and keep existing customers;

36

227.    THE HATCHERY joint venture had a duty to help Plaintiffs pursuant to its stated mission;

228.    The Lease Agreements between Plaintiffs' and THE HATCHERY, Chicago Joint Venture was commercial in nature;

229.    The commercial lease signed by Plaintiffs contain an implied covenant of peaceful possession of the property and THE HATCHERY joint venture racially discriminatory actions constituted a breach of this covenant;

230.    THE HATCHERY joint venture CEO used racial slurs toward Plaintiff's children referring to them as "little monkeys";

231.    THE HATCHERY joint venture treated minority business owners differently than other, non-minority tenants by employing different lease arrangements, ignoring requests, ideas and complaints, discarding ideas, by forcing stricter or less favorable terms on minority own businesses, requiring higher security deposits and shorter lease terms and by offering seemingly neutral reasons for their actions like claiming Plaintiffs did not turn in papers on time or failed to complete required classes or that defendant merely made a mistake;

232.    THE HATCHERY, Chicago Joint Venture actions were serious and substantial and more than mere annoyance and made it impossible or commercially unviable for Plaintiffs' to continue a business relationship and the lease agreement.

## 20. DAMAGES

233.    Plaintiffs have a reasonable basis for estimating loss that will not subject the trier of fact to mere speculation or conjecture;

234.    Plaintiffs' can reasonably calculate damages based upon profit and loss statements and financial projections; (See Par. 161-174 a.-g)

235.    Defendant, The Hatchery Joint Venture intentionally deprived Plaintiffs' of property rights  based on their race, and Plaintiffs' race was a "but-for" cause of the injury alleged herein; ) Lease Agreements incorporated herein by reference)

236.    Defendant, The Hatchery Joint Venture deliberately and intentionally engaged in tortuous interfered with Plaintiffs' business expectancy solely because of race. See Sec. 9., Par. 95-102, Sec. 10, Par. 103-120, Sec. 11, Par 121-127, Sec. 12. Par. 128-145 and Sec. 13. Par.147-150;

237. Defendant created and perpetuated a business expectancy; See Par. 181;

238. Defendant, The Hatchery Joint Venture intentionally and deliberately discriminated against Plaintiffs' because of race; See Sec. 12. Par. 146;

239. Defendant, The Hatchery Joint Venture deliberately and intentionally constructively evicted Plaintiffs because of their race;

WHEREFORE, for all the reasons stated herein, Plaintiff moves for Judgment in his favor and an award of damages against defendant individually and collectively in the amount of TEN MILLION DOLLARS for compensatory damages and TEN MILLION DOLLARS IN PUNITIVE DAMAGES, an Injunction Ordering The Hatchery, Chicago Joint Venture to cease and desist from discriminating against minority owned businesses, an Injunction Ordering The Hatchery Chicago, Joint Venture from attempting to collect predatory funds from Plaintiffs for all other just and proper relief.

## COUNT I.

## <u>CONSTRUCTIVE EVICTION & TORTIOUS INTERFERENCE OF BUSINESS EXPECTANCY IN COMMERCIAL LEASE AGREEMENT</u>

240. Plaintiffs allege paragraphs 1 through 239 as paragraph 240 of Count I;

241. To prove tortious interference with a business expectancy in Illinois, a plaintiff must show: (1) a reasonable expectation of a valid business relationship; (2) the defendant's knowledge of this expectancy; (3) the defendant's intentional and unjustified interference with the expectancy; and (4) damages resulting from the interference;

242. In the summer of 2019, Plaintiffs completed an on-line application with The Hatchery-ICNC Joint Venture to become residents at THE HATCHERY joint venture, with hopes and expectations of owning their own kitchen, obtaining affordable space, and receiving business assistance in an entrepreneurial community so they could share their business ideas and contribute to their respective community;

243. Months passed and THE HATCHERY, CHICAGO Joint Venture failed to act upon Plaintiffs application to become residents of THE HATCHERY joint venture;

244. Plaintiffs had a difficult time getting their application accepted by THE HATCHERY joint venture while white and affluent businesses and individuals were being accepted on a regular basis, sometimes without completing an application or being approved by the Board of Directors as per the rules;

245. Throughout the Summer and Fall of 2019, Plaintiffs continued to wait, call and make contact with THE HATCHERY joint venture administrative staff via the internet, but were continuously ignored pursuant to defendant's policy and practice of ignoring African American applicants;

246. The Hatchery, Chicago Joint Venture gave priority and favoritism to white owned businesses at the expense of Plaintiffs' and other minority owned businesses; Par. 218-232;

247. On December 19, 2019, after months of waiting, Plaintiffs application was accepted by THE HATCHERY joint venture;

248. The Commercial lease agreements between Plaintiffs' and The Hatchery Joint Venture and The Hatchery's Mission Statements and other representations, must be read together to show Plaintiffs' had a reasonable expectation of a valid business relationship between the parties; Section 2, Par. 32-45; Section 1, Par. 25-31; Section 11, Par. 146; Section 15, Par. 163-177; Section 17, Par. 180-213;

249. Defendant, The Hatchery Joint Venture had knowledge of Plaintiffs' business expectancy; Sec. 15, Par. 163-177;

250. Defendant intentionally and unjustifiably interfered with Plaintiffs' business expectancy; Sec. 8, Par. 94-102; Sec. 9, Par. 103-120; Sec. 10, Par. 121-127; Sec. 11 and 12, Par 128-146; Sec. 13, Par. 147-150;

251. The Hatchery Board turned a blind eye to racial discrimination and top level management made racially discriminatory and insulting comments; Sec. 11-12, Par. 146; Sec. 16, Par. 178-179;

252. As a result of Defendant's intentional and unjustified interference with Plaintiffs' business expectancy, Plaintiffs' were damaged and have a reasonable basis for calculating damage; Sec. 20, Par. 234-239;

WHEREFORE, for all the reasons stated herein, Plaintiff moves for Judgment in his favor and an award of damages against defendant individually and collectively in the amount of TEN MILLION DOLLARS for compensatory damages and TEN MILLION DOLLARS IN PUNITIVE DAMAGES, an Injunction Ordering The Hatchery, Chicago Joint Venture to cease and desist from discriminating against minority owned businesses, an Injunction Ordering The Hatchery Chicago, Joint Venture from attempting to collect predatory funds from Plaintiffs for all other just and proper relief

**COUNT II.**
**VIOLATION OF THE CIVIL RIGHTS ACT OF 1866 ((42 U.S.C. § 1982)**

253. Plaintiffs allege paragraphs 1 through 252 as paragraph 253 of Count II;

254. Under 42 U.S.C. § 1982, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property;

255. To prevail under 42 U.S.C. § 1982, a Plaintiff must allege that a defendant intentionally deprived them of a property right based on their race, and that race was a "but-for" cause of the injury. The complaint must specify the alleged discrimination and explain how the defendants' actions caused harm, including specific facts like the parties involved , the events and locations;

256. THE HATCHERY, Chicago Joint Venture attempted to discourage Plaintiffs' and discourages potential minority owned businesses from the West Side from applying to its programs by making them wait for unreasonable amounts of time before responding to their application or inquiry;

257. Additionally, T HE HATCHERY, Chicago Joint Venture discourages long term participation of minority owned business by making it unaffordable to participate in the long-run;

258. Plaintiff learned from 2020 throughout 2021, that Chapin Connor, a White male and Chief of Operations (COO) at The Hatchery joint venture allowed white applicants to by-pass the application process by directly paying cash to him under the table to become residents at the Hatchery Chicago;

40

259.  Naihal Wajid, a South African female of Indian descent, reported Chapin Connor's illegal activity to Priscilla Torrance in Human Resources, but no action was taken against him;

260.  After the Hatchery Chicago was audited, Chapin Connor resigned before the results of the audit were released;

261.  THE HATCHERY, Chicago Joint Venture charged Plaintiff and other minority residents a so called "Community Base Business Rent" which had a discriminatory and disproportionate impact on Plaintiffs and other minority owned businesses;

262.  The Community Base Rent is supposed to be discounted, but rent is increased every six (6) months until Plaintiffs and other minority tenants were paying market rates which they could not afford;

263.  THE HATCHERY, Chicago Joint Venture also included hidden costs in its discriminatory and misleading "Community Base Business Rent" program which includes providing kitchen space with no equipment and substantial hidden fees such as utilities and trash removal costs on top of rent;

264.  When THE HATCHERY "Community Base Business Rent" becomes so impractical, minority tenants are offered predatory loan options through Allies for Community Business thereby making their tenancy/residency more economically oppressive;

265.  Initially, Plaintiffs' were charged $2,600.00 a month for a 250 sq. ft kitchen space plus $300 for a kitchen storage fee, plus fees for utilities and garbage removal while some white residents like Jessica Romanowski who operated Private Catering paid no rent and no fees;

266.  Some white residents were charged $1,750 a month, others under $700 a month and some for no money but for the same kitchen rental space;

267.  Although equipment is donated to THE HATCHERY, Plaintiffs and similarly situated minority residents are forced to pay monthly rental fees for the donated property. For example, Tables @ $50.00 a month, Stoves @ $100.00 a month,

Coolers @ $100.00 a month, Refrigerators @ $100.00 a month, Ovens @ $200.00 a month, Warmers @ $100.00 a month, thereby exceeding the value of the donated property by a 12,000%;

268. Plaintiffs and similarly situated minority owned businesses were also required to exclusively purchase the most expensive cleaning materials from Equal Lab such as Sanitizers @ $190.00 for 2.5 gal and soap @ 430.00 per gal.;

269. Plaintiffs were not allowed to use Commercial Storage Units at THE HATCHERY joint venture but white owned businesses like Jessica Romanowski who operated "Private Dinning" were allowed to use commercial storage units;

270. Defendant, The Hatchery Joint Venture racially neutral policies and racially discriminatory practices had a racially disparate impact on Plaintiffs and a racially disproportionate impact on minority own businesses it is supposed to serve;

271. Plaintiffs' were told that they should be growing out of the space but white owned companies like Maison Cuisine, Aram Reed, Griffith foods and a few others never grown out of their space;

272. Plaintiff were denied the opportunity to participate in the *Midwest Foods Dairy Dessert Competitions* because they had not completed classes, when Plaintiffs' had in effect completed all requirements and was qualified to participate in a competition that winning would have paid for rent for an entire year or maybe two years

273. Plaintiffs asked to be a vendor at the *Fancy Food Show* and were told to submit an application; but after submitting an application, Plaintiffs' were denied under false allegations they has not completed the classes.

274. When Plaintiffs moved to a 500 sq. ft. kitchen in 2023, they were charged $3,300.00 per month for kitchen space plus $500.00 per month for their old kitchen space that was used as a storage unit plus the above mentioned hidden fees;

275. On February 1, 2025, Plaintiffs' were offered a base annual rent of $3,080 a month, a monthly storage fee of $80/dry, $100/cold, $100/freezer and $25/cage plus costs for heat, air conditioning, electricity, common area maintenance and real estate taxes and a security deposit of $2,600 plus $300 a month for small kitchen storage

42

and an administrative charge of $100 per month or 2% per month late fee, whichever is the highest, plus a $200 move-in fee and $100 fee for painting ceiling;

276. The Hatchery joint venture engaged in a policy and practice of retaliation against minority business and employees who complained about its discriminatory practices;

277. This retaliation included immediate termination of residency/tenancy or employment without notice or intentionally and deliberately interfering with Plaintiff's business opportunities;

278. For example, In December 2022, without notice or explanation, THE HATCHERY terminated six (6) African American owned small businesses who complained of unfair and discriminatory treatment such as (1) Big Momma Kitchen & Catering, (2) Coco Chili Catering, (3) Mr. E Chef Catering, (4) Cooking for the Soul Catering, (5) Work the Faith Catering and (6) Sweeter Redemption Catering and they were all banned from entering the building again;

279. African American employees who complain about discriminatory practices were deemed a problem and were terminated without notice or explanation and banned from the building, such as Derrick Lyons, the Kitchen Attendant, Cortney _____, Custodian, Darious Williams, Building Engineer, and Moncy Smith, Security;

280. White staff members who spoke up for West Side tenants they were either removed from the meeting or terminated;

281. Dani Zuchovicki brought discriminatory issues to defendants and she was told her comments as were too negative and THE HATCHERY forced her out;

282. Naihl Wajid complaint about THE HATCHERY's racially discriminatory practicas and noticed that event space was predominantly used by white owned and operate business;

283. Defendants received numerous detailed letters from former employees of The Hatcher outlining discriminatory conduct, but they were ignored with no follow-ap or offer of assistance;

284. Dani Zuchovicki concluded that over time, the benefits and discounts offered by THE HATCHERY Joint Venture were not good for minority owned businesses and she complained to CEO Natalie Shmulik and THE HATCHERY'S Board, but she was ignored and forced out;

285. Before being forced out, Dani Zuchovicki told THE HATCHERY executives that their discriminatory conduct did not align with its mission to exclusively support entrepreneurs from the West Side of Chicago with the tools, resources and access to affordable and discounted services;

286. Because Plaintiffs complained about discriminatory policies and practices, Defendants retaliated by either removing Plaintiffs from all its business opportunity programs, cancelling Plaintiffs; scheduled events or by rejecting Plaintiffs' business proposals to generate business revenue making it increasingly difficult for Plaintiffs' to pay rent in this racially discriminatory environment;

287. Plaintiff were removed by CEO Natalie Shmulik and other executives from the Blackhawks Vendor list, The Hatch Made Meals Program, The Fancy Food Show and Kitchen Competitions causing significant economic harm to Plaintiffs;

288. Plaintiffs' Pop Up Bruch was cancelled causing significant economic loss;

289. Plaintiffs' Patio build out proposal was rejected causing significant economic loss;

290. By 2022, Plaintiffs' were in debt to the Hatchery for an alleged $4,042.82 in back rent and fees;

291. By 2023, Plaintiffs' were in debt to the Hatchery for an alleged $12,320.00 in back rent and fees;

292. By 2024, Plaintiffs' were in debt to The Hatchery for an alleged $8,000 in back rent and fees:

293. By 2025, Plaintiffs' were in debt to the Hatchery for an alleged $25,377.35 in back rent and fees;

294. Defendant intentionally deprived Plaintiffs' of property rights based on their race and race was a "but-for" cause of their injury; All the deprivations constitute a

44

violation of Section 1982; Sec. 8, Par. 94-102; Sec. 9, Par. 103-120; Sec. 10, Par. 121-127; Sec. 11 and 12, Par 128-146; Sec. 13, Par. 147-150;

295.    Defendant management referred to Plaintiffs as "Colored People" and referred to Plaintiffs' children as "cute little monkeys" Sec. 11-12, Par. 146; Sec. 16, Par. 178-179;

296.    As a direct and proximate cause of defendants' conduct, Plaintiffs' were damaged; Sec. 20, Par. 234-239

WHEREFORE, for all the reasons stated herein, Plaintiff moves for Judgment in his favor and an award of damages against defendant individually and collectively in the  amount of TEN MILLION DOLLARS for compensatory damages and TEN MILLION DOLLARS IN PUNITIVE DAMAGES, an Injunction Ordering The Hatchery, Chicago Joint Venture to cease and desist from discriminating against minority owned businesses, an Injunction Ordering The Hatchery Chicago, Joint Venture from attempting to collect predatory funds from Plaintiffs  for all other just and proper relief;

DATED: November 26,  2025

Respectful Submitted,
s/David E. Neely, JD, Ph.D.
David E. Neely & Associates
Attorneys At Law
5619 S. Wabash Ave.
Chicago, IL. 60637
31231-8241